UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| ROBERT P. THOMPSON and VINNIE M. THOMPSON, a marital community,<br><br>                Plaintiffs,<br><br>    v.<br><br>WHIRLPOOL CORPORATION, a Delaware corporation,<br><br>                Defendant. | CASE NO. C06-1804-JCC<br><br>ORDER |

    This matter comes before the Court upon Defendant's Motion to Exclude[1] Plaintiffs' Expert Douglas Barovsky (Dkt. No. 30) and Defendant's related Motion for Summary Judgment (Dkt. No. 32). The Court has carefully considered the papers filed by the parties, including Plaintiffs' Responses in Opposition (Dkt. Nos. 38 & 42), Defendant's Replies (Dkt. Nos. 47 & 45), affidavits and exhibits filed in support by both parties, and relevant portions of the record. Finding oral argument unnecessary, the

---

[1] Defendant's Motion to Exclude was twenty-two pages long, ten pages longer than the twelve page limit set by the Local Rules for non-dispositive motions. LOCAL RULES W.D. WASH. CR 7(d)(3); CR 7(e)(4). Perhaps following suit, Plaintiffs' opposition brief was eight pages over length, and Defendant's Reply, six pages over length. Neither party filed a motion seeking permission to file an over length motion or brief. *See* LOCAL RULES W.D. WASH. CR 7(f). Due to the swiftly upcoming trial date, the Court considered the parties' motions in their entirety; however, in the future, the parties are strongly encouraged to consult the Local Rules for page limits before filing.

ORDER – 1

Court hereby rules as follows.

**I.     BACKGROUND**

In July 2005, a fire broke out in Plaintiffs' Bellingham, Washington home, causing substantial damage. (Compl. ¶¶ 3.2, 3.3 (Dkt. No. 1).) It is undisputed that the fire originated in the kitchen, in which two days earlier Plaintiffs had installed a new refrigerator, manufactured by Defendant. (*Id*.) In this product liability action alleging defective construction, (*see id.* ¶¶ 4.1–4.6), Plaintiffs intend to call Douglas Barovsky to testify that, in his expert opinion, the fire originated inside the freezer compartment of the refrigerator, in or around the freezer compartment's evaporator coil, and its source of ignition was heat generated from a failed high resistance electrical connection. (*See* Expert Disclosure Rpt. 5–6 (Dkt. No. 31 at 20–21); Barovsky March 2006 Rpt. 3 (Dkt. No. 31 at 11); Barovsky Decl. ¶¶ 10, 12 (Dkt. No. 40).)

Barovsky is a registered electrical engineer in the State of Washington and has been a member of the National Fire Protection Association ("NFPA") since 2002. (Barovsky Decl. ¶ 4 (Dkt. No. 40).) He is qualified as a fire investigator under the NFPA Standard 1033 Professional Qualifications and he has investigated the origin and cause of over 250 fires in Washington over the past five years. (*Id*. ¶¶ 4–5.) In total, he has six years of experience investigating and determining the origin and cause of accidental fires. (*Id*. ¶ 4.) He has been qualified as an expert concerning the origin and cause of fires in numerous Washington State courts and the federal district in which this Court sits. (*Id*. ¶ 5.)

Barovsky's involvement in the instant action began when he was contacted by an investigator working for Plaintiffs, who was of the opinion that the fire was caused by a malfunction of the Plaintiffs' new refrigerator. (*See* Barovsky March 2006 Rpt. 2 (Dkt. No. 31 at 9–10).) Plaintiffs retained Barovsky to examine evidence that had been removed from their home and determine the origin and cause of the fire. (*Id*. at 1; Barovsky Decl. ¶ 2 (Dkt. No. 40).) In the course of his investigation, Barovsky visited the fire scene at Plaintiffs' residence, examined the heat, fire, and smoke damage left by the fire, and examined the physical condition of both the refrigerator and range that had been in Plaintiffs' kitchen.

ORDER – 2

(Barovsky Decl. ¶ 7 (Dkt. No. 40).) Barovsky reported, with regard to his examination of the range:

> The Sears range and hood were examined. The Sears range sustained damage to the left hand side of the control panel. The patterns on the range were indicative of a fire and/or heat source located to the left of the unit. . . . There were no fire patterns or signs of anomalous electrical activity that would be indicative of a fire originating inside the range's control panel. The most significant fire damage to the range was likely caused by the plastic container . . . in which plastic kitchen utensils were stored. The exhaust hood was also examined and found to be uniformly fire damaged. The exhaust fan motor was also examined. The paper winding cover was not consumed by the fire; thus indicating that the exhaust fan motor winding did not overheat. The light bulb filament was found intact.

(Expert Disclosure Rpt. ¶ 4 (Dkt. No. 31 at 19–20).)

Based upon his experience, observations at the scene of the fire and of the evidence removed from the home, and review of testimony about the fire provided by firefighters and Plaintiffs, Barovsky concluded that the fire started in the freezer compartment of the refrigerator. (*Id.* at 5; Barovsky Decl. ¶¶ 7, 12 (Dkt. No. 40).) Chief among the observations that led him to this conclusion was that one of the two electrical connections for the defrost heater was badly burned, while the other electrical connection —located approximately seventeen inches away—exhibited almost no damage of any kind. (Barovsky Decl. ¶ 10 (Dkt. No. 40).) In Barovsky's opinion,

> this comparison of damage between the two electrical connections for the defrost heater indicates the cause for the damage to one of these electrical locations is high electrical resistance at that location prior to the fire. If the fire had caused this damage to the one electrical connection, I would have expected to see this damage to the other electrical connection as well.

(*Id.*) In addition, Barovsky noted,

> The physical evidence left after the extinguishment of the fire showed that a vast portion of the plastic liner for the freezer compartment . . . had sustained substantial fire damage, in some instances it had burned completely away, while the lower refrigerator compartment suffered virtually no fire damage at all. The difference between the substantially damaged freezer compartment and the virtually undamaged refrigerator compartment indicated to me this fire likely started in the freezer compartment.

(*Id.* ¶ 12.) Barovsky also tested the insulation in the freezer to see if it was combustible and confirmed that it was. (*Id.* ¶ 11.) Finally, he noted that, in his opinion, evidence of wire melting at the heating coil as referenced in a Consumer Product Safety Commission ("CPSC") recall notice in September 2005 of

ORDER – 3

certain Whirlpool brand refrigerators is consistent with a poor electrical connection for the defrost heater of the refrigerators involved in that recall. (*Id.* ¶ 13.)

## II. LEGAL STANDARD

Although federal jurisdiction in this action is based on diversity of citizenship and Washington law governs the ultimate issue of liability, the Federal Rules of Evidence govern expert qualification and the admissibility of proposed expert testimony. Expert testimony is admissible:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

FED. R. EVID. 702. The party seeking to introduce the expert testimony bears the burden of proving its admissibility. *See, e.g.*, *Lust v. Merrell Dow Pharms., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996). Trial courts serve as gatekeepers, evaluating proposed expert testimony for qualifications, reliability, and relevance. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589–90 (1993). In this role, the trial court must determine (1) whether the proposed expert is qualified to testify as an expert by knowledge, skill, experience, training, or education, and (2) whether the reasoning or methodology underlying the expert's proposed opinion is reliable and relevant. *Id.* at 589–94.

The trial court, however, must be careful to avoid supplanting the adversary system or the role of the jury: "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* at 596. *See also* Advisory Committee Notes to the 2000 Amendments to Rule 702 ("[R]ejection of expert testimony is the exception rather than the rule. . . . [T]his amendment is not intended to provide an excuse for an automatic challenge to the testimony of every expert."). The district court's decision whether to admit proposed expert testimony is reviewed for abuse of discretion, and the Court of Appeals will only reverse if it is "left with a definite and firm conviction that the district court committed a clear error of

ORDER – 4

judgment in admitting" the testimony. *Clausen v. M/V New Carissa*, 339 F.3d 1049, 1055 (9th Cir. 2003).

## III. ANALYSIS

Defendant argues, first, that Barovsky is not qualified to render an opinion on an alleged manufacturing defect in this case, and second, that his proposed opinions are unreliable and irrelevant, in that his methods were unscientific; his opinions are based on unsupportable inferences; his "source of ignition" opinion relies on the recall notice for an unrelated product; and his opinion is unreliable because it was developed solely for the present litigation. The Court addresses each argument, below.

### A. Barovsky Is Qualified To Offer an Expert Opinion As To the Origin And Cause of the Fire

The standard for qualifying expert witnesses is liberal, as Rule 702 "contemplates a broad conception of expert qualifications." *Thomas v. Newton Int'l Enters., Inc.*, 42 F.3d 1266, 1269 (9th Cir. 1994). As such, a witness can qualify as an expert on the basis of "knowledge, skill, experience, training, or education." FED. R. EVID. 702. Generally, an expert need not be officially credentialed in the specific matter under dispute, *see United States v. Garcia*, 7 F.3d 885, 889–90 (9th Cir. 1993); it is enough that the witness has qualified training or experience in a general field related to the subject matter of the issue in question, and that the resultant specialized knowledge is sufficiently related to the issues and evidence that the proposed testimony will be of assistance to the trier of fact. *See id.* (approving of district court's consideration of expert opinion testimony regarding the trauma a sexually abused child would face from testifying in court or testifying via two-way closed circuit television, "[a]lthough [expert] had no particularized expertise on the subject of child testimony through closed circuit television, she had considerable experience working with . . . sexually abused children"). An expert's lack of particularized expertise goes to the weight accorded his testimony, not to the admissibility of his opinion as an expert. *Id.* at 890 (citing *United States v. Little*, 753 F.2d 1420, 1445 (9th Cir. 1984)).

As detailed above, Barovsky has significant credentials and experience in investigating and

ORDER – 5

determining the origin and cause of accidental fires. In challenging Barovsky's qualifications, Defendant focuses on his lack of particularized expertise, arguing that Barovsky is not qualified to render an opinion on an alleged manufacturing defect in the Whirlpool refrigerator because he has no experience in refrigerator manufacture or design, and his fire investigation training has not specifically addressed refrigerator fires. (Def.'s Mot. 5–8 (Dkt. No. 30).)

Defendant's Reply brief makes no further mention of Barovsky's expert qualifications, and specifically does not deny that, when investigating and determining the cause and origin of a fire, *NFPA 921: Guide for Fire and Explosion Investigations* (2004 ed.),[2] a widely recognized authority on the subject, *see, e.g.*, *Shuck v. CNH Am., LLC*, 498 F.3d 868, 875 n.3 (8th Cir. 2007); *Bryte v. Am. Household, Inc.*, 429 F.3d 469, 478 (4th Cir. 2005), does not require the sort of particularized knowledge urged by Defendant. Accordingly, the Court finds that Barovsky's education and experience qualifies him to offer an expert opinion as to the origin and cause of the fire in this case. Barovsky's lack of particularized expertise in refrigerator manufacturing and design and refrigerator fires goes to the weight of his testimony, not the admissibility of his opinion as an expert.

### B.     Barovsky's Testimony Is Sufficiently Reliable

In *Daubert v. Merrell Dow Pharmaceuticals*, the U.S. Supreme Court listed four nonexclusive factors that a trial court might, in the exercise of its discretion, consider in determining whether proffered expert testimony is sufficiently reliable: (1) whether the theory or technique can be tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential error rate of the theory or technique; and (4) whether the theory or technique enjoys general acceptance within the relevant scientific community. *Daubert*, 509 U.S. at 593–94. These factors are not exclusive, and trial courts have wide latitude in determining whether an expert's testimony is reliable and which factors go into making that determination. *See, e.g.*, *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152

---

[2] Hereinafter, the Court refers to this publication simply as "NFPA 921."

ORDER – 6

(1999).

In arguing that Barovsky's proposed expert testimony is not the product of reliable principles and methods, Defendant takes issue with Barovsky's failure to conduct three types of tests. First, although he admitted that such testing could be done, Barovsky did not conduct any testing to determine whether a high resistance connection in the defrost heater at issue could cause a fire. (Barovsky Dep. 133:8–11 (Dkt. No. 31 at 45).) Second, he did not conduct any testing to determine whether, assuming a fire did start inside a refrigerator's freezer compartment, it would self-extinguish or it would escape the freezer compartment. (*Id.* at 134:1–6 (Dkt. No. 31 at 46).) Finally, he has not conducted any testing to determine what would happen to the interior of a freezer compartment if it was attacked by fire from the outside. (*Id.* at 134:24–135:3 (Dkt. No. 31 at 46–47).)

In light of the circumstances of this case, Defendant's complaints about Barovsky's failure to test are more properly considered by the jury in weighing his testimony, rather than providing the basis for disqualification. As Defendant acknowledges, the failure to test does not automatically render expert testimony regarding the origin and cause of fires inadmissible. *See, e.g.*, *Hickerson v. Pride Mobility Prods. Corp.*, 470 F.3d 1252, 1257 (8th Cir. 2006) (holding admissible a fire causation expert opinion where the methodology involved no testing but the application of specialized knowledge to observations of a fire scene). Further, Barovsky explained that he was unable to conduct meaningful testing in this case because, due to extensive fire damage, the defrost heater in Plaintiffs' refrigerator could not itself be tested, and the particular defrost heater that was located in Plaintiffs' freezer is no longer manufactured. (Barovsky Decl. ¶¶ 8–9 (Dkt. No. 40).) That Defendant finds "[t]his excuse . . . less than believable," because the refrigerator at issue was new and Barovsky was retained not long after the fire, (Def.'s Reply 9 (Dkt. No. 47)), again goes to the weight properly accorded Barovsky's testimony, not its admissibility. *See, e.g.*, *Martin v. Shell Oil Co.*, 180 F. Supp. 2d 313, 319 (D. Conn. 2002) ("The *Daubert* factors and scientific methodology require that an opinion be testable, not that it necessarily be tested. While the plaintiffs place themselves at risk of strong cross-examination, the underlying explanation is not flawed

ORDER – 7

1  for failure to test an explanation[.]").

2  Next, Defendant contends that Barovsky's proposed testimony is unreliable because his

3  "causation theories have not been subjected to peer review; neither has [he] published on his theory

4  regarding high resistance connections," the rate of error of his theory is unknown because of his failure to

5  test, and—Defendant contends—"Barovsky acknowledges he was unaware if his theory would be

6  generally accepted in the scientific community." (Def.'s Mot. 14 (Dkt. No. 30).) Defendant's arguments

7  in this regard seem to strain to fit into the four factors suggested by *Daubert*. Regardless, Plaintiffs

8  succeed in rebutting, largely by referencing NFPA 921, which specifically recognizes that a high

9  resistance electrical connection may cause a fire:

> **8.9.2.3 Poor Connections.** When a circuit has a poor connection such as a loose screw at a terminal, increased resistance causes increased heating at the contact, which promotes formation of an oxide interface. The oxide conducts current and keeps the circuit functional, but the resistance of the oxide at that point is significantly greater than in the metals. A spot of heating develops at that oxide interface that can become hot enough to glow. If combustible materials are close enough to the hot spot, they can be ignited.
> * * *
> **8.10.4\* Overheating Connections.** Connection points are the most likely place for overheating to occur on a circuit. The most likely cause of the overheating will be a loose connection or the presence of resistive oxides at the point of connection. . . . [A]n overheated connection on a duplex receptacle will be more severely damaged than the other connections on that receptacle.

(NFPA 921, §§ 8.9.2.3, 8.10.4 (Dkt. No. 39 at 7–8).) The Court accepts this as sufficient demonstration

that Barovsky's opinion that a high resistance electrical connection could have caused the fire at issue has

been subject to peer review and enjoys general acceptance in the relevant scientific community.

Consistent with the above, Barovsky noted:

> [O]ne of the two electrical connections for the defrost heater that I believe was responsible for starting the fire looked different from the other. . . . The difference, which can easily be seen by simply looking at the remains of the defrost heater itself, is that one electrical connection is badly burn damaged while the other electrical connection, approximately seventeen inches away, exhibits almost no damage of any kind at all. In my opinion, this comparison of damage between the two electrical connections for the defrost heater indicates the cause for the damage to one of these electrical locations is high electrical resistance at that location prior to the fire.

(Barovsky Decl. ¶ 10 (Dkt. No. 40).) Defendant's expert's opinion that even if the connection had

ORDER – 8

overheated, it could not have generated enough heat to have started a fire, (*see* Boughton Dep. 68:3–69:15 (Dkt. No. 48 at 29–30)), is again, a conflict best left for the jury.

Similarly, the Court rejects Defendant's contention that Barovsky's proposed testimony should be excluded because it is "based on unsupportable inferences." (Def.'s Mot. 15 (Dkt. No. 30).) In making this argument, Defendant reduces Barovsky's opinion that the fire was the result of a high resistance electrical connection to a statement that the heater element connection "didn't quite look right"—referencing Barovsky's observation that one electrical connection was more badly burned than the other—and then concludes that his theory is based on "sheer speculation." (*Id.* at 16.) First, the Court disagrees that the fact that Barovsky's theory is based largely on his own observations, interpreted by his experience, while utilizing methodology accepted by NFPA 921, leads inevitably to Defendant's conclusion that the theory is "sheer speculation." Further, it is the Court's understanding that Defendant does not possess, and the parties have thus far been unable to obtain, the construction specification for the electrical connection at issue. In fact, the Court denied Plaintiffs' motion to compel Defendant to provide these specifications, (*see* Dkt. No. 41), largely because Defendant claimed to neither be in possession of, nor have a right to obtain them from the component manufacturer. The Court will not, therefore, exclude the testimony of Barovsky—an engineer who has personally observed numerous such connections and who compared the connection in the subject refrigerator with an exemplar—on such basis. If Defendant has evidence of how the electrical connection was put together or how it should have appeared prior to the fire, it should have provided that to Plaintiffs in discovery. Similarly, that Barovsky tested only the expanding foam insulation, and not both the insulation and the freezer compartment's plastic food liner, despite admitting that having not seen an exemplar, he was not sure which combustible would have ignited first, (*see* Barovsky Dep. 129:3–15 (Dkt. No. 48 at 18)), is not sufficient to disqualify his testimony. Defendant's failure to test argument was addressed, and rejected, *supra*. Finally, the Court will not exclude Barovsky's testimony based on his failure to take a photograph of the alleged defective connection. It is sufficient that he took an x-ray that was provided to Defendant's expert.

ORDER – 9

1  Defendant's final argument in this vein contends that Barovsky's proposed opinion testimony is
2  unreliable "because it was developed solely for the present litigation." (Def.'s Mot. 21 (Dkt. No. 30).)
3  The Court agrees with Plaintiffs that this "very significant fact to be considered" in assessing the
4  reliability of an expert's opinion, *see Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 841 (9th Cir.
5  2001), is more properly used to exclude experts whose theory or technique was developed solely for the
6  litigation at issue, instead of experts who apply a theory or technique that enjoys general acceptance
7  within the relevant community to the facts of the case after being hired as an expert. Consistent with this
8  premise, the Ninth Circuit has explicitly stated that this concern may be addressed by

> precisely [explaining] how [the experts] went about reaching their conclusions and point[ing] to some objective source—a learned treatise, the policy statement of a professional association, a published article in a reputable scientific journal or the like—to show that they have followed the scientific method, as it is practiced by (at least) a recognized minority of scientists in their field.

12  *Id.* (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1318–19 (9th Cir. 1995)) (alteration
13  in original). Notably, the above-quoted decision held that the district court in *Metabolife Int'l, Inc. v.*
14  *Wornick*, 72 F. Supp. 2d 1160 (S.D. Cal. 1999), had abused its discretion in excluding expert testimony.
15  *See Metabolife*, 264 F.3d at 850. As such, Defendant's reliance on the district court's decision in
16  *Metabolife* to support its argument that Barovsky's testimony should be similarly excluded, is
17  unpersuasive. (*See* Def.'s Mot. 21 (Dkt. No. 30).)
18  That Barovsky's opinions about the origin and cause of the fire are based on the methodology set
19  forth in NFPA 921, satisfies the Court that this factor does not provide a basis for exclusion. The Court
20  does not find Defendant's argument—raised for the first time in its Reply—that Barovsky failed "to
21  adhere to NFPA 921's basic methodology," (Def.'s Reply 4 (Dkt. No. 47)), sufficient to negate
22  Barovsky's testimony to that effect. Specifically, Defendant claims that Barovsky's methodology was
23  contrary to NFPA 921's command that "[u]ntil data have been collected, no specific hypothesis can be
24  reasonably formed or treated. All fires, however, should be approached by the investigator without
25  presumption." (NFPA 921 § 4.3.7 (Dkt. No. 48 at 32).) In support, Defendant cites Barovsky's

ORDER – 10

deposition testimony, in which he stated that, after examining the refrigerator and range in his office, he "was leaning towards the refrigerator" as the cause of the fire, although at that time, he had not yet gone and visited the scene of the fire. Again, while the Defendant is free to cross-examine Barovsky about whether he began to form his conclusion as to the origin of the fire before he visited the fire scene—but after he had examined the refrigerator and range—the Court does not find Barovsky's statement that he was "leaning towards the refrigerator" to be such a deviation from NFPA 921's methodology to bar his testimony in its entirety.

Finally, the Court notes that Defendant's contention—raised for the first time in its Reply brief—that the fact that one of the electrical connections was more severely burned than the other does not necessarily mean that the severely burned connection was defective (Def.'s Reply 3 (Dkt. No. 47)), misses the point. The Court does not read Barovsky's opinion to be based solely on the fact that one connection was more badly burned than the other. His opinion also relies upon his examination of the stove top (which Defendant's expert believes was the point of origin of the fire), his observations at the scene, and his determination that the stove top was not the point of origin.

### C. The 2005 CPSC Recall of Other Appliances Is Irrelevant

The relevance prong asks whether the testimony is sufficiently tied to the facts of the case to be of use to the trier of fact in understanding the evidence at issue. *Daubert*, 509 U.S. at 591. The evidence must have a valid connection to the disputed material facts in a case. *Id.* at 591–92. In other words, there must be a "fit" between the testimony and the issues to be resolved at trial. *Id.* at 591.

Defendant contends that any reliance on the 2005 CPSC recall of certain Whirlpool brand refrigerators is misplaced, as the products identified in that recall were not manufactured by Whirlpool, the primary purpose of the recall was to address a potential shock hazard when the defrost heater coil could become exposed inside the unit, and "[w]hile the exposed heater wire identified in the CPSC recall could also melt or burn the unit's interior plastic food or liner [sic], there is no indication that a fire occurred inside the freezer or all-refrigerator unit, escaped the unit, and caused an external fire." (Def.'s

ORDER – 11

Mot. 20 (Dkt. No. 30).)

Plaintiffs offer no serious rebuttal of Defendant's showing that the appliances subject to that recall were different models than the one at issue here, produced by a different manufacturer, addressing a different risk. Plaintiffs' assertion that some of the refrigerators subject to the recall were sold under Defendant's brand name is insufficient to overcome the declaration of Stephen Boughton, who was previously employed as Defendant's Product Safety Manager for refrigeration products, (Boughton Decl. ¶ 2 (Dkt. No. 49)), which presents detailed explanation as to the differences between the refrigerators subject to the recall and the model involved in the instant action. (*See id.* at ¶¶ 5, 7–11, 13.)

Accordingly, finding that the 2005 CSPC recall is not relevant to the issues involved in this case, insofar as Barovsky's conclusions about the ignition source rely upon that recall notice, they are unreliable, irrelevant, and potentially highly prejudicial. However, because the Court does not read Barovsky's conclusion that the ignition source was most likely a failed electrical connection to be wholly based upon the recall notice, it will not bar his testimony on that subject, to the extent it is based on other evidence, i.e., his personal observations, interpreted by his experience and subject to reliable methodology, such as that approved by NFPA 921.

**IV. CONCLUSION**

For the foregoing reasons, the Court DENIES IN PART and GRANTS IN PART Defendant's Motion to Exclude Plaintiffs' Expert Douglas Barovsky (Dkt. No. 30). Defendant's Motion for Summary Judgment (Dkt. No. 32) argues only that, if the Court were to exclude Barovsky's testimony, Plaintiffs would be unable to support their causation theory. Because the Court declines to exclude the majority of Barovsky's testimony, Defendant's Motion for Summary Judgment is DENIED. The parties are reminded that the Court's decisions regarding the admissibility of evidence are preliminary decisions only. The parties remain free to object to the admission of specific evidence when it is offered, in context, at trial.

SO ORDERED this 13th day of May, 2008.

ORDER – 12

*John C. Coughenour*
John C. Coughenour
United States District Judge

ORDER – 13